The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable Robert J. Steigman presiding. Thank you, Mr. Bailiff. Good morning, counsel. This is our case number 423-0146, the State of Illinois v. Carlos T. Jones. Will counsel for the appellant please state your name for the record? Edward Wittring for the appellant, Carlos Jones. Thank you. Will counsel for the appellant please state your name for the record? Kara Jones for the State of Illinois. Okay, Mr. Wittring, is that pronounced correctly? Yes, Your Honor. You may proceed on behalf of the appellant. Thank you, Your Honors. May it please the court? Counsel. Counsel. My name is Edward Wittring and I'm with the Office of the State Appellant Defender. I represent the appellant, Mr. Carlos Jones, on this appeal. And so for today, I want to address the shot spotter issue first. It was the second argument that was raised in the opening brief before turning to the remaining arguments as time permits. Which argument was that, counsel? The second argument, the shot spotter issue. Go ahead. So on the shot spotter issue, Mr. Jones argued that the circuit court reversibly erred in its inconsistent rulings on the shot spotter evidence in that it permitted the state to introduce a map that purported to depict the different locations of where the gunshots originated. Is that the map he wanted introduced? Your Honor, Mr. Jones' position is he did not want the map introduced. He objected when the state attempted to admit and publish the map and his objection was expressly overruled. Now, he did use the map to a limited extent during Officer Grinsley's cross-examination and he did reference the map. However, in that process, he never asked for it to be substantively admitted. He never formally asked for the judge to admit evidence for the jury to get substantive evidence. Excuse me for the moment. You didn't answer the question, Justice, that I would just ask. I'm sorry. Yes. Wasn't that the map which the defendant offered? Wasn't this the evidence he offered? Now, you went into what happened afterwards, but you didn't answer that question. My position is he didn't offer it for admission, although he referenced it. Although he referenced offering that the trial court denied, how did that differ from what the state ultimately presented and which was accepted? So, he did offer, to clarify, he did offer a part of the map, or not part of the map, part of the ShotSpotter report that listed the discharge times and he did admit that, asked for the circuit court to admit that into evidence and it was admitted. But my point here is that that is distinguishable from the map itself and the list of data from the trial. It doesn't have the same foundation, or not foundation, hearsay, confrontation, concerns because it doesn't involve a level of interpretation that the map does. The map is the expert determining that the shots occurred in a specific location and that's particularly problematic here where the censors initially determine that the shots occurred somewhere else. Let me ask you this, is there some issue here as to whether shots were fired in the alley where the officers were running? As to the specific spot where the first gunshot is located, yes. That's not my question. I didn't ask where in the alley. Is there some question as to whether shots were fired in this alley where the officers were running? No, your honor, to that question, there is no question to that aspect. To what extent does any of this matter? How is this, it seems to me, minimally probative and not the least bit prejudicial because it's at most simply supplemental to the testimony of the officers, which seem to me to never be impeached that shots were fired in this alley, isn't that correct? I would argue here that it is prejudicial because the state did use it as substantive evidence that one shot originated further south, which is further south in that alley. How is it prejudicial when the defendant himself explained to Woods that the reason for the shots was to get the cops off of him? And I'm sorry, I missed the first part of that question. How can it be prejudicial when the defendant's own statements to Woods was that the reason for the shots was to get the cops off of him? And my interpretation and Mr. Jones's interpretation here of the statements on the overhear recording that you're referencing, I believe is that he doesn't actually admit that he shot at the officers during the recording. And although he does agree with some of the statements, he says, I had to do it to get them the F off of me. And and and my interpretation of that comment is that, well, OK, wait a minute, if you're going to interpret a comment, you need to interpret it within its context. If you just take the words out of context, then you can pretty well give it any interpretation you want, put it in the context of the conversation. That was that the jury heard the defendant's voice. And had the testimony of Woods. That he said, I did it to keep the get the cops the F off of me. And your honor. So my response would, I guess, be twofold to that first. These admissions purported admissions that were directed to Mr. Jones were made in the context of a prison or excuse me, not a prison, a county jail. And so there there are different. Connotations and for reason, making statements that they shouldn't necessarily be taken for the truth, but the second part of that, I understand that once he realizes they've got him on tape, he's got to come up with some excuse for why he said that. But that doesn't make it true. Well, in the over here, he also did state his version of the case, too. And so he stated that he believed that Officer Wade, I hope I'm saying that correctly, had unholstered her weapon and she discharged it in the in the alley. And then he believed that Officer Grinsley was confused by that and believe that he was firing and started returning fire at him. And so even though he does make statements that are consistent with the state there, he also makes statements that are inconsistent with it as well. And so he is. But that's what that's that's why the juries have to weigh the evidence. They decide credibility witnesses and. Take all the evidence in context with the other evidence they receive, I guess, your honor, and I'm not arguing here that the evidence was insufficient, I'm arguing. Obviously, that the evidence was closely balanced for the terms of a prejudicial analysis or a forfeiture argument under the first prong of the plein air doctrine. Unfortunately, my questions are a long road around back to Justice Steigman's comment in light of the fact that the defendant himself. Has made these statements. What prejudice is there to the shot spot? And I'm going to refer to the state's closing argument where they're using the shot spotter as purported independent objective corroboration of this witness's testimony, where the jury is here being faced with two different versions of events, and that is whether or not. Officer Grimsley saw a muzzle blast from Mr. Jones's location and. Fired, returned fire or the other version of the overhear, which is that Officer Wade slipped on the ice, discharged a weapon, surprising everyone and causing this chaos. And on that question, the state is using spots shot spotter that they referenced it multiple times. The closing argument. And the defendant did not objective. The defendant did not. The defendant did, but my point for that would be that the defendant, once the shot spotter map is in evidence, then he can argue alternative. Arguments such as the shot spotter isn't reliable, but even if it is, it doesn't show a gunshot from from my location. So, Mr. Wittrig, if I could ask about that, I think it was defendants exhibit six that defendant wanted to have admitted in the court denied. It's sort of it's called about shot spotter and it gives sort of an explanation of how the process works. And I think that the thing that he was interested in there was that it's accurate within a range of twenty five meters, eighty two feet, a radius of twenty five meters or eighty two feet. Is that the central thing that he wanted in from exhibit six? And wasn't that also testified to by the second officer Grinsdale? So so officer Grinsdale did address and say that it was generally inaccurate in his experience, I believe it was officer maybe Mushan. And if I'm saying that correctly, who then testified that it was only accurate to within twenty five. But the report, the extra part of that report also detailed other limitations to two shot spotters. The shot spotter itself recognizes that it can only accurately locate up to 90 percent of door incidents that I cannot guarantee 100 percent detection. Right. But isn't any prejudice from shot spotter related just to the map? Because as far as you acknowledge, there were shots fired. Yes, the fact that it says there were shots fired in the area of the alley, that that's already part of the case. Isn't the question about whether there was an extrapolation from that map to connect to who shot first or where was the first shot fired? Yeah, that's that's the issue that the state. Pointed out that our shot was probably from Mr. Jones's location and that and that's what they were using shots water for in this case, this this wasn't a case where it shots water was just used to explain why the officers were in the alley or why they responded to the scene. It was used as substantive proof that this first shot occurred further south in the alley when the sensors were originally. Identified that the shot was elsewhere and an analyst later than moved it into the alley to Mr. Right. But he didn't he didn't plead self-defense or anything like that because he didn't. He never acknowledged he had a weapon. Right. So does it matter who shot first if the shot came from him? No, no, he didn't. He didn't plead self-defense. It doesn't matter where the first or who shot the first shot, but the state is using it to in conjunction with the video showing them entering the alley where he is indeed first. So he would be further south in the alley than the officers who are in pursuit and chasing after him. And Officer Grinsley said that he was about 10 to 12 feet from defendant and Officer Wade was in between the two of them. So we're talking about a distance of maximum 12 feet. Yes. Three people involved in the shooting. Yes, your honor, it was it was very close quarters within that alleyway as it was a narrow alleyway as they were running towards the cell. Oh, is there anything else from that exhibit six that would have been important to defend this case other than what was also testified to by the police officers? And I would again point out to the fact that in that in that section, he was trying to have Officer Mushan address that it does explain that shot spotter isn't guaranteeing 100 percent detection, that it isn't claiming that's 100 percent accurate. It only comes in 90 percent. Right. All that would do is tell us that they would get more shots than were counted. That doesn't really matter here. What might matter is where the position of. The first shot came from, because it might correlate to that being from defendant. Well, I believe that that exhibit does address not only detection, but also location, its ability to locate. But that's what the officers gave in their testimony. So it's already in evidence. And your honor, it would further the defense's ability to demonstrate how inaccurate shot spotter was in this. But everybody acknowledged that it's not accurate. And that that wasn't even an issue. So sorry, your honor. Except for the state in closing, it claims that it is accurate. OK, and that's our. That's one of the things the jury is told to disregard. If it doesn't meet with the evidence, you disregard. And yes, your honor, generally, as the jury was instructed in this case on to disregard evidence or arguments that weren't in evidence, but the map was in evidence. Yes, your honor, that the map was admitted. Oh, I would like to, unless there are further questions on the shot spotter issue, I'd like to turn to some of the other questions in this case. All right. I do want to address the first argument now, and that is claims of prosecutorial error that occurred during closing argument. All right, so first, Mr. Jones raised that the prosecutor referred to his decision to exercise his constitutional right to self-representation as an attempt to throw a pity party for the jurors and. The he objected, Mr. Jones objected, and the circuit court sustained the objections, telling the state to just say that he chose to represent himself. Well, counsel, isn't this correct, isn't the state direct that one, he chose it and two, given the nature of his argument, especially when he didn't testify to these things, he was essentially telling the jury I'm being picked on. Look at all these people picking on me and implicitly, if not explicitly, saying, gee, you know, here I am without a lawyer. And it's not just the prosecutors and judge. Everyone's picking on me. So you should have pity on me, isn't that isn't the state's response to that entirely appropriate? And my argument here is by calling it a pity party, it's going too far. And I believe the circuit court recognized that by just those words. In particular, those words, regardless of the context, just the use of those words is so inflammatory that this conviction should be reversed because they use the words pity party, period. Well, in this context, the state knows why Mr. Jones is exercising his constitutional right to. Well, and so does he. And so does he keep repeating to the jury. That's kind of the point. On that point, in your reply brief, you make this what I view to be an astonishing statement, the bottom of page one. But the state overlooks that the prosecutor here impugned a specific motive to Jones for employ to the jurors to join him in a pity party, even though the prosecution was well aware that Jones had discharged counsel due to his counsel's acquiescence, the state's efforts to obtain his DNA. Unquote. Now, it's hard for me to even begin to discuss all the things I find wrong with that claim. But let me begin with the one that on what basis is there in the record that the state knew this, understood this, or that it would have mattered as to why he chose to go pro se instead of having counsel? Well, the state. The it was it was litigated his his his issues with counsel on this DNA evidence and the state's ignoring that here and saying that he's had he has a specific purpose for attempting to go pro se, and that is to deceive and trick the jurors by throwing a pity party and trying to bite. So that's why the state understands that the defendant is complaining about how his trial lawyer was handling DNA matters. That then means that they can no longer argue to the jury what the jury has, in fact, heard. And you talk about the state is arguing that the defendant is going pro se for pity party. Well, we don't have to see from the record that that was his intent to begin with. But that's what happened, isn't it? I mean, given what he said and how he said it, he's asking for the jury to engage in a pity party with him. Seems to me that the prosecutor has this correctly described whether that was his intent or not to begin with, which seems to me to be totally irrelevant. That's the circumstances which the defendant, how he behaved, with which the jury was presented and to which the prosecutor cabinet. What's the what's the problem with that? Well, your honor, I distinguish this case from the case in Palmer where he in Palmer, the defense's defendant is specifically referencing his pro se status in an effort to have the jurors decide the case on something other than the facts that were before them. But Mr. Jones, in his closing argument, even though he portrays himself as against the state and as against everyone else, he still asked for the jurors decide the case on on the basis of the evidence. And so he doesn't. So he isn't. He doesn't have this heartfelt plea to to take into consideration his his pro se status as opposed to delaying the case. Aren't the prosecutor's remarks in closing arguments essentially a request of the jury to disregard the claims that the defendant has made that he is somehow being picked on and said, decide this case based upon the evidence actually presented. And if that's a fair reading of the prosecutor's remarks, what could possibly be improper in them? Well, your honor, here, I would argue that at least the circuit court found them improper by sustaining the MJ, the objection. That's not my question, counsel. I don't care what the circuit court said or did. I'm asking you on appeal now, given what the prosecutor said in that context, how can we possibly find anything in that to be improper? Oh. And I can just maintain that, that I believe that it went that the specific use of the term pity party should not have been used by the state and it could have accomplished its goals of having. Excuse me, I see that my time is up. Can I go ahead and finish? I'll give you a chance to finish. So I'm sorry, I didn't hear your response, your honor. No, you can finish your point that you were responding to. All right. Thank you. That that pity party and imputing this improper motive to Mr. Jones, but by framing it in that way, it went too far when they had other means to accomplish their objection of asking the jurors to disregard Mr. Jones's statements. Well, thank you, counsel. You have an opportunity to address this again in rebuttal. Ms. Jones, on behalf of the employee, you may make your argument. May it please the court opposing counsel. My name is Kara Jones and I am here on behalf of the state attorney's prosecutor representing the state of Illinois. I want to address the issue that was just being discussed first. Um. Defense counsel takes issue or argues that he objected and the and that the objection was sustained and then they made the comment again, as you I'm sure you're aware from reviewing my brief, I've made numerous arguments about the fact that the defendant has forfeited most of the issues that he has raised in his appeal by either failing to raise an objection at the time of the trial and or failing to assert it in a post-trial motion. I would just point out that although the first time that the prosecutor did make the comment about pity party, this objection was sustained and the judge said you need to reword it in a certain way. And she did so. And the defendant did not make a another objection. And the courts have, of course, held that a contemporaneous contemporaneous objection at trial, if it's not made forfeits the claimed error, even if the justice sustained defendant's previous objection. And, of course, it's as the court has been pointing out in its questioning, it's our position that the defendant invited whatever, although we don't believe that there was error in the statements of the that the prosecutor made it prosecutor made in closing argument, including the words pity party. He invited the response that he received from the prosecutors because, I mean, he was claiming that there was a conspiracy. He was inferring or arguing to the jury that the that he wasn't he didn't get all the evidence that he that the prosecutors were hiding evidence or editing videos to only show you what they wanted to see. The argument she made was perfectly acceptable in response to not only the arguments he made in his closing, but the questioning that he made of the witnesses. And, I mean, he specifically said to the jury several times, see what I'm up against. I've been up against this the whole time. First, it was the state. Then it was the judge and the officers. So that argument was completely appropriate. With regards to this issue, with regards to the prosecutor making a statement about him being pro se, the defendant himself in his closing argument told the jury, I went pro se. I went pro se because I had a disagreement. There was a conflict. I discharged my attorney because there was a conflict with my attorney. And I know the evidence best and I know how best to defend myself. So the prosecutor, as the court has pointed out, there's no prejudice. And the prosecutor, again, pointing out that he was acting pro se and that you should not give him a break because he still held the same standard as an attorney. When the defendant himself has already emphasized the fact that he went pro se because he didn't trust his lawyer. Of course, he didn't trust anybody and he believed everybody was up against him. So, I mean, there was no error in her statement and and your honors, because there's no error, you don't have to consider the whether the evidence was closely balanced under the plan error doctrine. But just in general, with regards to most of the issues that have been forfeited, the evidence in this case was not closely balanced. So with regards to all of the evidence or all of the arguments and issues that have been raised by the defendant, plain error, he cannot establish plain error because the evidence in this case is not closely balanced. The evidence established that the officers got a call, they went to the scene, the description of the call was that there was suspicious individuals. He was dressed and was of the same ethnicity. I'm going to interrupt you, apologize for it, but I do have a question about the shot spotter. Yes. And I was going to get to that, your honor. I think that the the question in my mind is about the introduction, not of the data because the defendant introduced the data about timing, but about the map and location. Do you ever argue in your appellate brief that under the rules of evidence that it was proper to admit that map? I do not, your honor. The but I would say that the the introduction and the the the state's use of the map and the admission of the map was once again was acquiesced in by the defendant. Well, not not so much the map, though. Right. I mean, I know he used the data in terms of the sequence of the shots, but he never tendered the map and he objected when the state asked to admit the map. Your honor, he did object, but then there was a further discussion and the judge overruled it. And then and it's interesting, your honor, because the the record is not as clear as it probably could be because he was pro se. Exhibits didn't always get it marked the proper way. But when the when the state was trying to introduce their map, he he said the state tried it, went to introduce the map and the and the defendant objected not on any foundation basis, which is the objection that should have been made and which he did not make. And therefore he forfeited the argument. Well, but he referenced he referenced the the the ruling when he tried to admit some part of the report, not the map. And the objection was foundation. And he called back to that. Isn't that essentially telling the court that's the reason he's objecting? I don't think it is, your honor. I mean, he basically said you you wouldn't let me do it, but you let you're letting her do it. I don't think that's adequate. If I as an attorney stood up and said that in court and he's representing himself and is held to the same standard as I would be, the judge wouldn't find that to be a foundation argument. They would say that's not a proper argument, not allow me to do it. But here's the thing about that, your honor. After he made that objection, the the court then stated that the court overruled the objection, but advised the prosecutor that she needed to lay a foundation as the time and date of the map. OK, so we're still talking about the map. And so she obtained additional testimony and then she asked the judge to publish the map to the jury. But at this point, the map had not yet been admitted. So then the judge asked the defendant his position and he responded, go ahead. It was only at that point that the judge then admitted the map. So it's our position that that exchange, when you read it in context, in its totality, the defendant actually acquiesced in the admission of this map and therefore cannot now object. Another reading would be that he he acquiesced to. Publication after the trial court stated he would admit the map, but the judge had not yet stated that he would admit the map, he told the the prosecutor that she needed to lay a foundation with regards to the time and date of the map. He had made no reference. The judge at that point had not made any statement whatsoever whether he would ultimately admit the map. But he had not done so at that point. He overruled the defendant's objection. But in essence, the court, the court then stated, although he overruled the objection, he actually stated or she, I don't know what what whether the judge was a female or a male, he said, you know, you need to lay a foundation, you need to do so, you need to provide us with the date and time. So the prosecutor did that. And then after when the defense, the defendant was asked about, you know, what is your position when she went to ask to publish the map, she can't do until it's admitted, he said, go ahead. So based upon all of that, it's our position that the map was properly admitted. And he can't object to it because of his acquiescence to the same. And of course, it was the defendant who who initially the defendant in his opening statement made reference to ShotSpotter. So it was the defendant. I think you've got to be careful. ShotSpotter is not one thing. It's it's got data from audio. It's got a report that sets out that data. But then it's got this map which comes from some computer generated. Triangular measurement, right? That's correct, your honor. But the defendant himself used a map, he didn't move, as has been pointed out, he didn't move to admit it, but he from the from the looking at the. At the record, it's clear that he marked it, marked and admitted a chart about the timing, the sequencing. So during cross examination of Grinslade, Officer Grinslade, the defendant presented Grinslade with a map with a map. And even though there's discussion, it's some confusion is exactly what it was. But it's clear that it was the original spot ShotSpotter map. Whatever he presented in terms of a map was never marked by a defendant as an exhibit, right? Because it was never. I believe it was. I believe it was exhibit three because the defendant says this exhibit is the same picture that they had been discussing of the alley, which I believe is exhibit two that he presented. But but the defendant says it's just the original ShotSpotter. So I think he did mark it and he it also appears from the from the record that he put it up on the screen for the jury to see, even though it wasn't admitted and it was and he didn't ask permission to to publish it. And the reason I say that is because the subsequent questioning of the of the of the officer was all about the dots on the map. And there's reference to see this dot here. And you see that dot there. I guess when I read that, I assumed he was handing that to the witness. But you think the record will show that it was displayed to the jury? Your Honor, it's as I said, the record is unclear, but when I read that the record, I read it as indicating that there I mean, if not, I believe that your judge would have said the jury doesn't know what you're talking about because there are several other times in the record that I believe the judge tried to make sure that the record was clear. But in this case, it's unclear whether the I would say it's unclear as to whether it was on the on the screen or not. But I mean, I the question was about the dots and where they were located. And you see this dot and it was over here. So my interpretation of that, although the I will submit admit, your Honor, that the record is very unclear. Yeah, I'm looking at defendants exhibit three and it's labeled at the top Illinois State Police Zone four. So it doesn't appear to be the shot spotter map, except what the defendant said. And when he presented it to the witness was it's just the original shot spotter. Yeah, I think he's wrong about that because I'm looking at it. Unless that's the same map and that was put into the report, even though it's the original, because the evidence was that the officers get an original. I understand if you look at that report, the numbers on there appear to relate not to the shots, but to where the the projectiles were found. Your Honor, I don't recall and I apologize for that. It's OK. But once again, your Honor, even if the there was no appropriate objection, so and it wasn't properly raised in the post trial motion. So the the issue with regards to the shot spotter map and its admission was was defendant. So he's got he is required to establish first first prong plain error because he does not in any way address address under that whether there was error. Because that's our first step in the in the plain error analysis, correct? Your Honor, it I'm going to be very candid with the court and if I mean, I believe it's be hearsay if it had not been forfeited. And, you know, Mushan was not the person who generated the report. And it wasn't part of the organization that generated, correct? That's correct. I mean, I don't think there's any way that I can argue that that Mushan was an appropriate person to testify about the report. And I don't do so in my in my appeal, in my argument, your Honor. But we don't have to consider whether there was error in this case because he can't meet the prompt first prong of point plain error, which is closely balanced evidence. Thank you. I want to talk briefly about the arguments, unless there's any further questions about shot spotter or the argument, the closing argument issue that was raised by defendant. I want to briefly address the issue with regards to the over here. And the defendant argues that the over here was that the judge improperly allowed the made the application. And they argue two bases. First, that the petition for the eavesdropping device did not establish reasonable cause for the believing the conversations concerning the felony offense would be obtained through the use of the device. Both petitions and there, of course, were two in this case because the first one wasn't able to be executed within the time allowed. And so they asked for an extension to do the second one. It outlined the facts, provided the details of the encounter. Before he ran the shots fired, it outlined everything, all the evidence they had developed up to that point. It's at a further identified would as an individual who resided in the same pod. So he had direct contact with the defendant and that Jones had previously disposed information to him about the shooting incident and the details regarding the same. And the application stated that it was believed that conversations relating to Jones's charge will be overheard because Woods had provided statements on two occasions that Jones had disposed information and that these conversations had occurred on numerous occasions and on a regular basis over the past eight months while both have been incarcerated in the jail. And the defendant's argument is that there's no information in the application as to whether those conversations would continue under any specific time frame. And so basically they're arguing because there has been a gap in time between the time that they first interviewed Woods and the time that the application is being sought that there's no guarantee that these conversations would occur again. But the courts have held, People versus White, the time between the previous discussion and the eavesdrop is not important for guilty knowledge is not usually dissipated by time. So the first argument that they've raised, the fact that there's there's no specific statement that that he believes that there'll be a conversation is not really a valid reason for arguing that the application was inappropriate. The second argument is that the application provided no basis to verify Woods report of Jones alleged statements and that that to find reasonable cause based on the application asserting hearsay, the circuit court issuing an eavesdropping authorization must have basis for crediting that information. Well, the application didn't have as with regards to what Jones had told Woods, that's not hearsay. It's an admission by a defendant that, you know, he shot or as the justice, as you have pointed out, he he specifically says in the eavesdrop that he shot to get them the F off of him and but he held back some just in case they didn't get the message the first time. The. The case of People versus Meyer that I cite is is factually consistent, and in that case, the court found that the application was appropriate because the. The statements set forth came from the defendant's own mouth, I mean, now the defendant in their reply brief points out that, oh, there were also letters, too, but what the court references that there were direct the statements that supported the application contain direct statements from the defendant in addition to the letters. So the defendant's arguments with regards to the applications of the eavesdrop advice and the failure and the denial of the motion to suppress are not valid and should be rejected by this court, as it was by. The lower courts on the motion to suppress in conclusion, your honors, we'd ask that you thank you, counsel, Mr. Richard, get your medal, sir. Thank you, your honor, I would like to just briefly touch upon the shot spotter issue of whether or not it was preserved and regardless of whether or not. Well, I just want to be clear, the state and no point argues that it's not subject to plain air review, that it's that it becomes invited air so that it's way the state merely argues that it's subject to forfeiture. So I would ask the question of air, as you know, we have to ask whether the evidence was closely balanced. Are you claiming that the evidence in this case as to whether your client fired this gun at the officers was closely balanced? Yes, your honor, I am asserting that it was closely balanced. There there there wasn't any objective evidence that Mr. Jones was responsible for firing the weapon that night. There were 12 pieces of fired evidence that were found at the scene of nine casings, which were attributed to an officer. So we have to disregard his statements. Is that correct? And the jury in this court should consider his statements, but he does provide inconsistent statements. And part of his statements that he gives to in the over here is that he believes Wade had unholstered her weapon. And in this chaotic run through the alleyway where it's dark at night. Well, counsel, let me be more clear. He was charged with aggravated discharge of a firearm and the claim is he shot at the officers. What is the evidence in this case that makes that a closely balanced issue? What is the evidence that he didn't do that? And your honor, I would point to the lack of objective evidence through the videos that they don't point out that or they don't elucidate who the shooter's identity or the sequencing of the shots. There was a third mysterious person in the alley who was firing at the officers and somehow they missed that. And the defendant missed that when he was talking about the incident. No, no, Mr. Jones, I don't believe. Well, who was firing the gun in the alley? What is the what is the closely balanced claim regarding that it was your client who fired the gun in the alley? Yes, your honor, it's his version of events is that it was Officer Wade as she was running through that she discharged her firearm and everyone became confused at that point. And also Grinsley started shooting at Mr. Jones. And so he didn't he didn't fire a weapon at the officers. It was the officers who started firing at him. What exactly was it that the defendant did then to keep them the F off of him? Excuse me, your honor. I mean, if he didn't shoot, what was it that he was doing to keep them the F off of him? Well, I believe I'm sorry. I believe his comment was, I got to get them the F off me. Right. And in the context, what was the context? And the context was they were they were discussing the case and in particular, they were discussing the the revolver versus, I believe, the other. Right. Because he had just talked about how the revolver doesn't leave casings. Right. I believe that was Mr. Woods who talked about it, but there was there was he he acknowledged it. He agreed there was a discussion. OK. And then he says, I did it to get them the F off of him. And again, my point is, he said, I got to get them the F off me. And I don't believe that that actually is a statement that he fired a revolver to get them off. So what was the part about? I I kept a couple back just in case I need something. So sorry, your honor, for interrupting you. No, it's OK. I posited in the in the reply. I believe it was in the reply brief that that would or maybe it was in the opening brief. I can't recall this instance, but that would also be consistent with him just being armed, reserving rounds in case they were needed. Not necessarily that he had previously. Why would he be reserving rounds if he hadn't fired rounds? I believe it could be read read either way, and that would be for the jury to jury to consider. Also, I have a question about your argument concerning the shop spotter map. You're arguing the trial court erred in admitting it. Is is this because it's improper hearsay or are you claiming somehow that this the admission of the map violated the confrontation clause? I argued in the opening brief that it was a violation of the confrontation clause, and if it wasn't a violation of the confrontation clause, then it was also inadmissible hearsay. And I believe I also that a lot of times up. But I want to follow up to make sure I understand your position on this. I can understand the argument that the map is hearsay, but. Is it is it your contention that all improper hearsay violates that is admitted, violates the confrontation clause? No, your honor, that's that's not my position. What about what about this map? The admission of the map violates the confrontation clause in this case. Yes, your honor. So. It almost immediately after the shooting occurred, they were able to identify Mr. Jones as a suspect, and so the investigation began into him. And then at this point, the shot spotter took this this this brawl and the team of analysts there took took the raw data and determined that the the shooting occurred at a different location and then submitted that to to the police. And so in this instance, it's the primary intent of this of the creation of this report is is as potential testimony or testimony or witnessing against Mr. Jones would be at a future trial. And that would be my that's a position outlined.  Um, because I equated the report to the. The the the the the report and. Um, it was it was a in the opening brief, I referenced a case where it was where there was a FOIA letter from from the the. It from the state police, and I'm arguing that this report was hand about to that, just to be clear, you're not arguing that all improperly admitted to say violates the confrontation clause, are you? No, they're different. They're different. Thank you. OK, well, thank you. Your time is up. Thank you, Ms. Jones, Mr. Richard, for your presentations this morning. The court will take this matter under advisement and run their decision in due course. Thank you.